Good morning. My name is Chuck Nestor. Excuse me. I'm getting over a cold. I hope my voice will hold up. Eldoretta Chemical is a nitric acid manufacturer. I'm going to have to, for this deaf guy, speak into that microphone. Yes, sir. I don't know if you can raise that table a little bit. I think I'll get closer to the microphone. I think that'll do it. Yeah, that's good. Yeah. We'll give you an A for that one. Thank you. Let me orient you a little bit to the matters we're dealing with. Eldoretta Chemical is a nitric acid plant located in Eldoretta, Arkansas, in Union County, and it discharges into what are called unnamed tributary B, which flows into unnamed tributary A. These are essentially drainage ditches near the Eldoretta Chemical plant, and those drainage ditches flow into, downstream, into Flat Creek, which merges into Haynes Creek further downstream. Is the map north? Is it downstream north, then? Is the top of the map north, or is that just turned around? The map is actually turned upside down, but that's the way it's... It goes south. That's in the administrative records. So I'm using... The only thing that goes north in this country is the Red River and North Dakota. Right. The water is actually flowing downhill here towards Louisiana, and this is Louisiana here. Yeah, right. So the pollutants that we're dealing with today are naturally occurring in the environment, chlorides, sulfates, and total dissolved solids. Arkansas made a decision back in the 1980s that it would adopt as protective criteria for its streams levels of these pollutants that were naturally occurring. It went out and looked at least disturbed streams and looked at what was naturally occurring and said, this is what we want to adopt as an initial standard for Arkansas. But they recognized that there would be industrial activity, there would be municipal treatment plants, all of which would add these chemicals to the environment, and the naturally occurring conditions wouldn't always be present. So Arkansas adopted a procedure in its rules that said, on a site-specific basis, we're going to let you change these naturally occurring conditions to a less stringent standard to accommodate industrial activity, to accommodate a municipal treatment plant, as long as you can prove that there is no impairment to the aquatic life. That's the criteria, because you can't make these changes if you impair aquatic life. That procedure has been in place in Arkansas for about 20 years. We've had at least 40 rulemakings in Arkansas under that procedure. They've all been approved by EPA until now, and that's the decision. And those procedures change the quality of the water for the worse, in some cases? If you call it worse, it increases the levels of chlorides or sulfates to represent what's occurring from the industrial or municipal activity. What kind of chemical plant is Eldorado? They make nitric acid in bulk, liquid nitric acid. They make fertilizers out of nitric acid, so they make nitric acid prills, and it's an inorganic chemical plant. What are they doing now? Now, this has been, their changes have been rejected. Are they still operating the same way until this case is heard? Yes. They've tried a number of different strategies in order to keep them in compliance, which are somewhat acceptable. They've entered into an agreement with two other industries in the city to put a pipeline into the Ouachita River, which bypasses these streams. So that's, what's the story of that pipeline? The pipeline went into operation August 1st of this year. So then is this case moved? No, sir. The pipeline is not always going to be operational, and Eldorado Chemical asked the ADQ to keep its permit in place so when the pipeline goes down, it doesn't have to shut down its business. I see. Now, I don't want to, I know you've got a limited amount of time, and it's a very difficult case, so I wanted to ask you, the new remedy, the new proposal that you have, takes care of UTA and UTS, but leaves out the downstreams of Flat Creek and Haynes Creek, is that right? Well, leaving it out is probably a confusing way to describe it. Well, it's not covered in the proposal, but it is downstream and would receive the liquid that's being in the water, and as I understand it, that's a big problem because it's going to change the quality down there from what EPA claims. Well, what Arkansas did to address that, and if you look at EPA's brief on page 24, EPA said that after the first rulemaking was done, where we were actually going to increase the rulemaking actually raised those standards for Haynes and Flat Creek. EPA's brief says, to respond to the sublethal failures, which were what your concern is, EPA urged EDCC to consider developing criteria values for Haynes and Flat Creek that will not result in aquatic life impacts. Now, that's exactly what happened. The increased levels of minerals that were part of the first rulemaking were rescinded. Haynes and Flat Creek have now returned to these ecoregion naturally occurring criteria. We did exactly what EPA asked us to do. Don't raise the criteria in Haynes and Flat Creek. Come up with something that will protect it. Those were Arkansas said, we'll do better than that. We'll take it all the way back to naturally occurring conditions and require that those naturally occurring conditions be enforced in Haynes and Flat Creek, and that's the status of the rule that EPA then rejected. Wouldn't that, though, prevent you from putting more in UTA and UTB because it's going to then flow down to Flat and Haynes Creek? Well, the way that that's generally, the way that that is implemented is through the permit process. Nobody can issue a permit to alterate a chemical, Arkansas, EPA couldn't approve it, that would allow these ecoregion values in Flat and Haynes Creek to be exceeded. It's illegal. Every permit has to protect the water quality downstream. So changing the water quality in UTA and UTB is independent from the permitting process? Well, we've already demonstrated that UTA and UTB can accommodate increased levels of minerals. That's the spiked wet test, right? Right, and those passed. Everything passed in UTA and UTB and EPA confirmed that the increase in minerals in those two But I think the concern is that it flows down and makes, because there was some impairment in the spiked wet test for Haynes and Flat Creek, wasn't there? Well, if you acknowledge that that single failure of the sublethal water flea is an impairment, and I question that as whether that's really good science, but assuming that what you say is true, that that wet test, that failure is an indication of an impairment, that was assuming that the increased levels from the first rulemaking would stay in place, and they didn't. Arkansas said, Okay, we'll take it back to the original values. We will protect it down to the ecoregion values. And they said that specifically. You know, EPA says, Well, the only thing that you've got in the record is information submitted by the Eldorado Chemical Consultants, and we don't think that that's good enough. Well, here's what Arkansas said specifically, and this was written by Arkansas. After the water quality standards were reinstated to the ecoregion values, and this is on appendix on page 1059, this rule ensures that the water quality criteria necessary and appropriate to preserve designated uses will be maintained. So Arkansas said, We're taking it back down to ecoregion values, and that will ensure that the criteria, that the downstream waters will be maintained because they have to be maintained and they have to be protected to those low levels. So does that mean, then, that you wouldn't be permitted to increase the amount that's being output? It would not be allowed to be increased over those numbers, 15 milligrams per liter chloride, I think 30 or 40 of sulfates. There are a number of permitting strategies that could be implemented to allow that to happen. For one, the pipeline could reduce the amount of flow that's going to happen. Eldorado Chemical has storage capacity that could do a release only during wet weather conditions to keep the concentrations. There are a variety of permitting mechanisms available to facilities to meet downstream water quality. And all EPA could say about this was, Well, it might not happen. If you look at EPA's decision, the actual decision that they made is appendix on page 94. EPA's decision was it may not provide for attainment of downstream water quality standards. I submit that that's not compelling evidence. That's not a reason to overturn Arkansas standards. Let me ask you this question. Now that the pipeline is in effect, has there been any negotiation with EPA such as this saying, Okay, we'll let you have your permit. And if you need it, and you start using the outlets, if it's shown that the water quality is affected, I assume affected as adversely downstream, including these creeks, you'll have to stop. Has anything like that ever been discussed? Well, all that information was available to EPA. We're obviously in an appeal where the record is closed. Well, I know you're in an appeal. But you've got to remember, this is a very technical question. The situation has now changed to some degree. And I'm just wondering if there isn't room. I don't know if you've ever read my case about reserve mining where I threw up my hands and I said, These are not cases for judges, even though we're forced to sign them. It's really cases for scientific people. Right. And all those things could happen if this case were remanded back to EPA. But I think the problem is the way this case came up on appeal, and it's really the primary reason, the primary issue for this appeal, and that's the difference between what EPA's role is in this process. EPA's argument is that the case of Mississippi v. Costill should rule the standard of review. And Mississippi v. Costill was a case where the court did impose an arbitrary and capricious standard, and they did allow EPA's decision to be upheld. But in that case, EPA wanted to enforce a 5 milligram per liter DL standard. EPA had published national criteria for that standard, and Mississippi was the only state in the region that had not adopted the national criteria. And in that case, the court said EPA has an obligation to impose national criteria. There are uniform standards. In that case, we're going to shift the burden. We think that EPA's standards should be enforced, and the state should have to prove otherwise. In this case, it's completely different. We have a standard that's the most restrictive standard in the country. It's more than ten times less than EPA's nationally published criteria. EPA asked for a literature review. It's more stringent than anything that was found in any literature search. And in that case, Arkansas said, here is a number that we think is protective of water quality. And in that case, we believe, under the Ina Road decision and the American Cyanamid decision, that EPA has to present compelling evidence to overturn that. Because if you don't do that, how does Arkansas' primary role in setting standards enforce? It's not. How do you define that different standard, though? You've said, well, in this particular situation, Arkansas has set their standards very strictly, so therefore you want a compelling evidence review of that. But what is the defining principle there? How do you apply that? Well, you look at the evidence that Arkansas has presented in favor of its decision that the downstream water quality is being protected, and you compare that to EPA's evidence, and EPA has to present compelling evidence. Maybe I didn't ask the question. But how do we decide when to apply your compelling evidence standard? Any time that the state is adopting a water quality standard other than a national criteria. And if you read the Mississippi v. Costle decision, you'll find that that is the rule that was established in that case. EPA, in a very recent rulemaking, and I've cited it in my brief, just a few months ago, September 4, 2013, they essentially adopted the same standard that I'm proposing here. They said, in that rulemaking, that states have the discretion to determine whether an existing use has been attained. They recognize when EPA is talking to the world on a national basis in a proposed rule where they're outlining what the landscape is, they don't differ from me. But in this case, in an advocacy, in a brief that's trying to win an appeal, they have a different standard than they're proposing Mississippi v. Costle. You won't find that in EPA's rulemaking. Well, keep in mind that now you've got a little different situation. I know one of the things that was asserted in the lower court was that EPA was playing politics, wanted to make sure they got the pipeline. Of course, that was rejected. And we reject it, too, but it's still down there. What's your suggestion, having in mind that we're not experts, as to how this case might be resolved by, say, going back to district court, letting an independent expert take a look at it and advise the district judge? That would be great. That would be a perfect solution. It would? Yes. Who would pay the expert? I know you have experts. EPA has experts. Of course, the parties have to pay an expert. I believe we could work that out at the district court level very easily. So what you really are suggesting, maybe that would be a good solution. That would be a great solution. I know what I'm eating into about rebuttal time, so if it's all right, I'll let EPA go. Well, that might be a solution for everybody. Let's see what EPA says, and then you can keep your time, and we'll examine further. Thank you. Good morning, Your Honors. May it please the Court, John Smeltzer for the EPA. Your Honors, the EPA reasonably disapproved the water quality criteria change that resulted from the third-party rulemaking in this case because Eldorado's evidentiary submission was critically deficient in at least two areas. First, Eldorado failed to provide sufficient evidence that the change in criteria would be sufficiently protective of the designated downstream use, the aquatic fisheries use, in Flat and Haynes Creek. The only evidence in the record that spoke directly to water conditions downstream as a result of this criteria change was the spike toxicity testing that Eldorado itself presented. That testing suggested that those levels would be associated with sublethal toxicity to aquatic organisms. The testing downstream? Yes, Your Honor. At those creeks? Yes. Not at UTA and UTS? UTB, yes. Yeah. Well, what do you think about the proposal folded out here just now? We've now got a pipeline. You're not saying it's necessarily bad because there's going to be a lot less effluent going into the water now, this water, now that you've got a pipeline, about remanding it back and seeing whether this would make sufficient change so that EPA and Arkansas and the company could come to an agreement. Your Honor, we are asking this Court to affirm, and if you do affirm, it will go back to the EPA and to Eldorado and Arkansas, and they can try to fill the holes that were missing in their initial evidentiary submission. We would have no problem with this Court affirming. We ask this Court to affirm. Well, of course if we affirm, then it's over with. But if we say there's some missing links here and the thing has changed and at least one of the parties would be willing to have an independent person, an independent signist come in and advise the Court, I don't know how EPA would feel about that. They have their own signist, and the Court is not unguided, so to speak, by an independent voice. Your Honor, well, if you affirm it, it's not over. And what I want to point to is what EPA said here on the record is that Eldorado failed to provide sufficient evidence. EPA suggested a couple of ways that Eldorado could provide additional evidence. EPA didn't flat out say, look, these criteria will never work. So EPA did not end this process in terms of a criteria change. The spiked wet tests for UTA and UTP were perfectly fine, weren't they? They did not show toxicity. At all? No impairment at all? Well, they were only testing for toxicity, sublethal or lethal toxicity in those organisms, and they didn't show. They did not show toxicity for the concentrations that were associated with UTA and UTP. That's correct, Your Honor. There was very little discussion of that in the EPA's opinion. That was my concern. Well, yes. I mean, what the EPA focused on was the concern with respect to the downstream waters, which are close, right? And they're not trying to change the criteria for downstream waters. Well, that's the second fundamental problem with this. If you don't change the criteria, right, then you are back to the ecoregion criteria. Can't that all be controlled by the permitting process? In other words, if it starts to create problems downstream, you crank back the permit, or you don't allow them to increase what they're permitted to discharge. Well, first, it doesn't. There's two issues. There's criteria and there's whether the evidence shows that they're adequately protecting the actual use. And so if you change the criteria back to ecoregion criteria, it doesn't show there isn't a problem with use. Changing the criteria doesn't change their permit, does it? No. So why can't this be controlled by the permitting process if, indeed, there is a downstream problem? Well, if the criteria at Flat and Haynes Creek are left at the ecoregion criteria, then the permit would have to have lower limits. The whole point of this was to increase the limits to permit the discharge. So that would be contrary to the entire focus of the rulemaking. It is one of two issues that EPA identified as being problematic here. The second issue continues to be the concern with downstream use and whether the criteria match. And, again, there's a distinction between, of course, the effluent limits that are put in a permit once the criteria are in place and just judging the criteria themselves. But what EPA did was to ask for evidence that if you change the criteria, if you relax the criteria in UTA and UTB, will the downstream uses be protected? And so what Eldorado did was follow through with that exercise and say, okay, if we relax these criteria, this amount of mineral loading from our facility will go downstream. There will be a cumulative impact downstream. That includes Eldorado's minerals and the minerals that are already there from legacy pollution, and it's that cumulative impact that was found to be toxic. But is it necessarily true? In other words, could the state of Arkansas have anticipated something like Eldorado putting in a wetland that might filter out some of these before they get to the creeks? When you talk about changes in criteria, Arkansas's regulatory system is unique because many states don't do it this way where the criteria change is so tied to an individual discharge. Normally you set the water quality criteria, and then the criteria are used to ensure that whoever is loading pollutants to a river system, their effluent limits won't cause a violation of the criteria. Arkansas has a special procedure where individuals' dischargers can ask for this third-party change for the specific purpose of essentially enabling their discharge. But from a regulatory perspective, the focus is the same. First you look at the criteria. Are the criteria protective? And EPA's review is the same. They don't look at the criteria as though they were approving a particular discharge or writing a permit. They do the review that's appropriate for a criteria change. And in looking at this proposed criteria change, again, two fundamental flaws. It doesn't show that the downstream waters will be protected, and it doesn't show that the now-existing criteria downstream will be met. And both of those things have to be met not only for EPA review purposes, but also under the continuing planning process, the CPP, that El Dorado mentions in its briefing. So the... How far downstream does it go? How far downstream does... I mean, how far downstream? You're allowing those water quality standards for UTA and UTB to affect Flat Creek and Haynes Creek, but they probably flow into two different other creeks and then probably into a river and then probably into the ocean. Right. And it's a question of reasonableness, Your Honor. As Mr. Nestor explained, the UTA and UTB are very low flow. They're mostly flow resulting from the facility discharge. Flat Creek and Haynes Creek are the two first real creeks, named creeks, that these discharges hit. That's not too far downstream to focus on, and El Dorado knew that because, of course, they included those two streams in their initial submission, and they presumably included those streams in their initial submission because the CPP specifically says... Excuse me, Your Honor. On page 335 of the appendix, one of the things they have to do in this third-party rulemaking is to document that all designated uses and criteria will be met in waters downstream of the area in question. That's designated uses and criteria. So when they set out to do their rulemaking, if they didn't change the criteria in Flat and Haynes Creek, they're not going to be able to meet that standard because they're increasing the criteria for UTA and UTB, and the minerals are flowing directly into Flat Creek and then into Haynes Creek. And so they went through the process to determine, okay, what is the cumulative impact of our minerals downstream in Flat and Haynes Creek? And they did the test. And the test showed there's sublethal toxicity. Now, Mr. Nestrude said he's not convinced with the science of that test, but it wasn't a single test. It's a test that's performed on a single sample for a series of dilutions, and it was done for both Flat Creek and for Haynes Creek. Both tests showed sublethal toxicity. Both tests were failures. There is some information in the record where El Dorado's consultant suggested, well, the results may not be indicative of the minerals in the water, but their consultant also said the test may be directly – or the results, the failures may be directly resulting from the statistical difference between the minerals in the control sample and the minerals in the synthetic sample that was designed to approximate Flat and Haynes Creek. So their consultant said, look, this may directly show that you've got a problem with sublethal toxicity. So the EPA said, look, that's not enough. Help us, give us something more. That's a gap, that's a hole in your information. And this court reviews the EPA's determination under the APA for arbitrary and capricious standard and gives deference to the scientific determinations of the agency. One of the strategies that El Dorado has adopted in this appeal is to try to shift the burden onto EPA, to make it be that the courts have to find that EPA presented some sort of compelling evidence to overturn a decision. But that's simply not the standard that's provided in the Clean Water Act or in the APA, and there's no authority for it in law. Mr. Nestrue talked about the Mississippi versus Mississippi, I don't have it here, Mississippi Commission on Natural Resources v. Castle, there it is, case and said that's a situation where the court has somehow shifted the burden back because of the particular subject matter of that case. But that's not the way the Fifth Circuit decided the case, Your Honor, and I draw your attention to 625 Fed 2nd at page 1276, where the court is responding to the argument that the state's determination should be reviewed under arbitrary capricious standard, and the court says, quote, nothing indicates a congressional intent to restrict EPA's review of state standards to the issue of whether the state acted arbitrarily capriciously. Has the state taken any position in this lawsuit disappeal in the district court either? The state has not appeared formally as a party in this litigation. The state, of course, did approve the third-party rulemaking that was initiated by El Dorado. That's a bothersome deal because, you know, I assume the state has good sinus and looked at it carefully also. Well, Your Honor, I don't know that you can make that assumption on this record because there's nothing from the state responding to the concerns that were raised by the EPA. I see. And, again, the standard of review is... Well, they could probably recognize that, you know, it's your baby. You know, you're the godfather of them all, EPA over the states. Well, I think it relates to the unique aspect, again, of this particular type of rulemaking that Arkansas has put into place, this third-party rulemaking, where the burden is put on the applicant to make a showing. Arkansas approved it. They looked at it. There's no question about that. But they didn't provide any information to the EPA, for example, that the EPA would have had to review. There's just nothing in the record that specifically says, look, I see that concern, EPA, but here's the answer. Here's why you're looking at it wrong. There's no technical expertise, information, whatever, from the state of Arkansas in the record. Ultimately, that might be relevant in the terms of this court or the district court exercising review over the EPA's decision. But, again, the APA sets the standard of review, and the APA focuses on the decision-maker, the federal decision-maker. And even though EPA's role in this context is an oversight role, the question that the court asks is, did EPA exercise that role arbitrarily or capriciously? And under the law of the court, the technical determinations that the agency makes are within its expertise are accorded great deference. The EPA is accorded great deference in making those kinds of determinations. So tell me again, why can't the EPA, even if Arkansas approves the new water criteria for UTA and UTP, and if you were to approve it, why can't the concerns for downstream problems be taken care of by the permit? I think to some extent they might be, but that's a complicated process. It's a process that would be led, again, by Arkansas and not by EPA. But EPA can veto it, right? In terms of a permit approval, the veto process is very complicated. There's not a simple EPA review and veto. If Arkansas approves a permit that creates downstream problems, EPA can veto that, can't they? Your Honor, it's not an issue that was briefed and argued, and so I don't want to talk beyond my area of expertise. I believe there is EPA review of permitting, but the process for that is obviously complicated, or is complicated. And the question isn't, could a different decision have been made? The question is, was it arbitrary and capricious to make this decision that EPA did, was to say, look, you can't meet the criteria. And, again, it's in addition to the criteria. They can't show that the new ecoregion criteria will be met. They still haven't shown that the downstream uses will be protected. And, you know, they're two separate things. So tell me again, how far downstream do they have to go?  Well, the record doesn't show what the mineral criteria are in Smackover Creek, which Haynes Discharge is into. And so it's not clear whether the loading that's being talked about in this case, once it gets all the way down to Smackover Creek, will be an issue. It wasn't identified as an issue by Eldorado. They set the parameters of the rulemaking by identifying Flatton Haynes Creek as being the relevant streams. And it's not unreasonable for the EPA to follow up with that. Didn't they unset them when they said, okay, we don't want to change those anymore. We just want UTA and UTV to be changed. And the tests turned out to be perfectly fine in UTA and UTV. But, again, they removed them in a way that doesn't solve the concern, which is the regulations require you to show that you're not impairing the downstream waters, regardless of whether you're changing the criteria for the downstream water. And the regulations require you to show you can meet the downstream criteria. They only added to their burden, Your Honor. They didn't take away from the burden to show that the downstream uses were going to be met. They just added the burden of now they've really ratcheted it up and tightened the criteria, and there's nothing in the evidence to show the criteria can be met. Let me address a couple other issues with respect to the standard of review because a couple other authorities were cited by Mr. Nestor is somehow shifting, again, the burden to EPA to show compelling evidence, and neither of those authorities are relevant to this context. The first I want to address is American Cyanamide. That was a case that was decided by the EPA's Environmental Appeals Board, not a circuit court decision. It was a case that involved a permit that was issued by EPA, and the issue in the case was whether the EPA had faithfully followed state law on effluent limitations in imposing a particular permit condition on effluent limitations. The Environmental Appeals Board upheld what the EPA did in that case, but in a footnote said, look, if the state had definitively interpreted their effluent limitations differently than what EPA did, we would potentially lead to a different result. We would require compelling evidence in that context. The key difference, though, is they were talking about a state standard that EPA had to include in the permit, purely standard of state law. There wasn't an issue of compliance with federal law or minimum Clean Water Act requirements. So if you're solely talking about compliance with state law, certainly if the EPA is going to interpret the state law differently than the state, then it makes sense to impose a higher burden. Here, what you're talking about is EPA's fundamental oversight role in determining whether the state criteria meet the minimum requirements of the Clean Water Act. The EPA is the expert agency that's been designated the duty to do that oversight and is the agency that deserves the deference. Completely different set of circumstances. The other authority that was identified was the 2013 rulemaking that has some language about giving credit to the states in areas where there's some uncertainty. The rule that they were talking about there is a rule that prohibits states from changing, making changes from preexisting uses or uses that were attained at some point in the past. It's a particular Clean Water Act rule, and it's not a designated use. What they're talking about is if at some time in the past history you achieved this high use in a waterway, you can't change away from that, even if the water has become impaired since. And they're talking about looking back into the past and trying to figure out from historical evidence whether a use had ever been met at some point in the past. I think it's 1972. Can I interrupt a question here? Sure. There's a really sole issue about the EPA saying we don't have enough information dealing with downstream. Is that really the question here, or is it both downstream and UTA and UTB? Yes, the answer is it's downstream, but the further answer is it's near downstream, and there's no way to not focus on downstream in this rulemaking, in this context, because you can't change the criteria where it's being changed and not impact those downstream waters. So you have to look at them in this rulemaking, and that was critical. And what other tests? Does EPA suggest any other tests? It said you don't have enough information for it. Well, El Dorado came forward and said, look, here are some problems, for example, with our spike toxicity testing. EPA said, okay, well, run it again. Show us that those are really problems, and then solve this issue. You know, is it directly related to the statistical difference that's showing sublethal toxicity? Is that related to the criteria change, or is it not? And EPA also said, well, look, show us information to how to separate out your pollutants from the preexisting pollutants so we can focus on that as well. So, yes, there are things that EPA suggested the applicant could do. What the applicant ultimately decided was, look, we're just going to pull Flatton Haynes Creek off the record, out of the rulemaking, and somehow that will solve the problems. And we're here to say that didn't solve the problems. It just increased the burden on El Dorado. Do you have at hand a site to the regulation that says in assessing these water quality standards, you have to look at downstream effects? We talk about it in our brief. It's the Clean Water Act Reg 131.10b. It talks about the state's duty to look to downstream criteria and uses. The statute that's specifically focused on the EPA's duty is 131.5, which talks about making sure that the criteria changes meet uses generally. Okay, thank you. Thank you. Thank you. There are— Mr. Nestor, before you get started, can you cite to me a case? Every case I've ever been involved in, reviewing an agency, we apply arbitrary and capricious abuse of discretion, error of law type review. I've never seen one where we would do compelling—forcing them to present compelling evidence. Are you telling me that the Mississippi case says that? No, the Mississippi case does not say that. The Mississippi case said—well, actually, it kind of did. And this is 625 F. 2nd at page 1276, where the court said it was not unreasonable for the EPA administrator to interpret the act as allowing him to require states to justify standards not in conformance with criteria policy. Well, unreasonable sounds like an arbitrary and capricious standard to me. Right. So in that case, in that context, that court said when the state is refusing to adopt a national criteria, then the states have to explain why. But everything that I've read in every case, every court says the primary role in establishing these standards belongs to the state. So the question for this court and every court is how are we going to do that? We have two agencies. Congress gave the primary authority to the state. They gave the review authority to EPA. How are we going to protect and preserve the primary authority in the state if all we require EPA to do is present some evidence? But hasn't Congress also said that our review authority is under an arbitrary and capricious standard under the Administrative Procedures Act? Right. So if EPA does not present compelling evidence, then its decision is arbitrary. That's how you enforce the standard. And in this case, EPA didn't. But I think the underlying question of that is that there are two levels of protection that Arkansas offered to EPA. One is will we return the criteria to the ecoregion values? We all agree that those are protective. So the wet test was performed as if the criteria were increased to multiples of that number. Well, that's not going to happen now. So the wet tests were performed under conditions that would be illegal to occur. And EPA's only response to that is, well, it might happen. I guess Arkansas might issue an illegal permit and might allow this to happen. That's all speculative. That is not evidence. That's just pie in the sky. We all know that Arkansas has to issue a permit that will protect these ecoregion numbers in Flatton Haynes Creek. We all know that. That's the law. And it can't happen otherwise. I didn't hear EPA's attorney offer an explanation of why that won't happen. I sort of assumed that the spike wet test that was done in the creeks, the one that showed some impairment, sublethal impairment, that it reflected what would come out of UTA and UTB under the revised criteria your client was asking for. Am I wrong about that? If Arkansas authorized a maximum load to occur under all conditions, and it can't do that now. It's prohibited from doing that. So you're basically back to your argument that they can control this with the permitting process. Absolutely. And they have to. And Arkansas said that they would because they said that when we return those values back to ecoregion values, those downstream uses are now protected again. That's what they said. I think it's telling that when you asked counsel what was the regulatory criteria for assessing downstream uses, he accurately cited that rule, and that rule says the states are to do that. But EPA gets to review that. Right. But it's the state's role. EPA delegated that role to the states. So how do we preserve and protect the state's primary role in this process? And we believe that there is authority that says you should do it by making EPA justify itself with good evidence. Thank you, Mr. Nestor. Counsel, we appreciate your arguments today. It is a very complicated case, as Judge Bright pointed out. We'll do our best to resolve it in due course. Thank you for your argument.